UNITED STATES of America, Plaintiff,

v.

Jaime GONZALEZ, Defendant.

Crim. A. No. 95–52 MMS.

United States District Court,
D. Delaware.

Nov. 17, 1995.

Edmond Falgowski, Assistant United States Attorney, Department of Justice, Wilmington, Delaware, attorney for plaintiff.

John S. Malik, Wilmington, Delaware, attorney for defendant.

MURRAY M. SCHWARTZ, Senior District Judge.

## I. Introduction

In 1991, Defendant Jaime Gonzalez was acquitted in state court of several criminal charges arising out of a bombing and fatal wounding which occurred on August 15, 1990. On August 8, 1995, defendant was indicted in the United States District Court for the District of Delaware on federal charges arising out of this same incident (the "Indictment"). Defendant has moved to dismiss the Indictment on the grounds that (1) the federal prosecution is a "sham prosecution" warranting departure from the dual sovereignty exception to the Double Jeopardy Clause; (2) Count III of the Indictment is barred by the Double Jeopardy Clause of the Delaware Constitution because it contains, as an essential element, a state crime for which defendant has been acquitted; and (3) the federal prosecution was commenced after substantial pre-indictment delay, which has prejudiced his defense due to the unavailability of certain pieces of evidence and witnesses. For the reasons set forth below, defendant's Motion to Dismiss the Indictment will be denied.

## II. Factual Background

The following recitation of facts includes only those facts relevant to the Motion to Dismiss the Indictment. The defendant was indicted in the Superior Court of the State of Delaware in and for New Castle County on September 12, 1990 for his alleged involvement with the bombing. The five count indictment included the following charges: (1) first degree murder, in violation of 11 *Del.C.*

§ 636(a)(5); (2) first degree reckless endangerment, in violation of 11 *Del.C.* § 604; (3) first degree arson, in violation of 11 *Del.C.* § 803; (4) possession of a destructive weapon, in violation of 11 *Del.C.* § 1444; and (5) transportation of an explosive device, in violation of 11 *Del.C.* § 1338(b).

Trial commenced on April 23, 1991. Among those witnesses presented on behalf of defendant was his daughter Diana Gonzalez, who testified as an alibi witness to the effect that defendant was with her at all times relevant to the bombing. Other witnesses presented by defendant included a series of character witnesses who testified as to defendant's reputation for honesty and peacefulness in the community. Some of these witnesses also testified as to the victim's poor reputation for peacefulness. Of this group of witnesses, several are currently unavailable. Additionally, defendant offered the testimony of two percipient witnesses. One testified to witnessing the victim constructing a homemade bomb, and the other testified to purchasing batteries at a local store. Neither of these witnesses are available to testify at this trial.

Certain items of physical evidence were also offered at the state trial which have been lost, destroyed or are otherwise unrecoverable. Defendant offered a yellow bucket of tools found at the victim's home as evidence that the victim himself constructed the bomb which led to his fatal wounding. While the government asserts that the items were returned to the victim's wife, they cannot be located. Certain photographs, telephone bills, and pieces of floorboard removed from the defendant's home which were offered at the state trial have also been lost. On May 9, 1991, the jury found the defendant not guilty on all counts of the state's indictment.

On March 23, 1995, Deputy State Fire Marshall Tim Bush contacted Diana Gonzalez after receiving an anonymous tip that she may have been involved in an unsolved local high school arson case. During this conversation, Ms. Gonzalez revealed to Deputy Bush that her father, the defendant, was involved in the August, 1990 bombing. Deputy Bush conveyed this information to Mr.

Timothy Barron, a Deputy Attorney with the Delaware Department of Justice. On April 3, 1995, Mr. Barron called a meeting with attorneys from the United States Attorney's Office. Members from the New Castle County Police Department, the state Fire Marshal's Office, and the Bureau of Alcohol, Tobacco and Firearms were also present. At that meeting, the substance of the conversation with Ms. Gonzalez was revealed to the federal prosecutors. Assistant United States Attorney Edmond Falgowski determined that he wished to consider a federal prosecution, and requested a copy of Ms. Gonzalez's state trial testimony. Mr. Falgowski forwarded a copy of the transcript to Deputy Bush, and directed him to interview Ms. Gonzalez a second time.

On June 21, 1995, Deputy Bush spoke with Ms. Gonzalez for the second time, who again provided information incriminating the defendant. The United States Attorney's Office then decided to prosecute the defendant. On August 8, 1995, defendant was indicted in the United States District Court for the District of Delaware on the following charges: (1) Interstate Transportation of an Explosive, in violation of 18 U.S.C. § 844(d); (2) Carrying an Explosive during the Commission of a Federal Felony, in violation of 18 U.S.C. § 844(h); and (3) Traveling in Interstate Commerce with Intent to Promote the Delaware State Offense of arson, in violation of 18 U.S.C. § 1952.

On September 15, 1995, defendant filed the subject Motion to Dismiss the Indictment on the following grounds: (1) the Indictment violates the Fifth Amendment Double Jeopardy Bar in that it is a "sham prosecution" brought merely to vindicate the unsuccessful attempt of the State of Delaware to convict defendant; (2) the Double Jeopardy Clause of the Delaware Constitution bars the federal prosecution because Count III alleges as an essential element a crime for which defendant was acquitted; and (3) the four year and fifty-one week delay in bringing the Indictment constitutes a delay in violation of defendant's Fifth Amendment Due Process rights because defendant's ability to defend himself has been diminished due to the de-

struction of evidence and unavailability of defense witnesses.

## III. Analysis

### A. *Sham Prosecution*

■ Defendant's first argument in support of his motion to dismiss the Indictment is based on the Double Jeopardy Clause of the United States Constitution. Defendant asserts that the federal prosecution is merely a sham prosecution commenced solely to vindicate of the State of Delaware's failed 1991 capital murder prosecution. Under the reasoning of the United States Supreme Court decision in *Bartkus v. Illinois,* 359 U.S. 121, 79 S.Ct. 676, 3 L.Ed.2d 684 (1958), defendant argues that the facts presented in this case support a departure from the well-settled "dual sovereignty" or "separate sovereign" rule, which allows consecutive prosecutions by the state and federal authorities for criminal violations arising out of the same conduct.

The dual sovereignty doctrine is based on the common-law notion that a crime is an offense against the sovereignty of a government. The Supreme Court explained the doctrine as follows:

When a defendant in a single act violates the peace and dignity of two sovereigns by breaking the laws of each, he has committed two distinct offenses.... [W]hen the same act transgresses the laws of two sovereigns, "it cannot be truly averred that the offender has been punished twice for the same offense."

*Heath v. Alabama,* 474 U.S. 82, 88, 106 S.Ct. 433, 437, 88 L.Ed.2d 387 (1985) (quoting *Moore v. Illinois,* 55 U.S. (14 How.) 13, 19, 14 L.Ed. 306 (1852)). In *Bartkus,* however, the Supreme Court alluded to a possible exception to the dual sovereignty rule which would serve as a bar to a subsequent prosecution by a different sovereign based on the same set of facts. The facts of that case serve to illustrate the narrow exception.

■ In *Bartkus,* defendant was indicted in federal court for robbery of a federally insured savings and loan association, in violation of 18 U.S.C. § 2113. *Id.,* 359 U.S. at 121–22, 79 S.Ct. at 676–78. Defendant was tried and won an acquittal. A few days later, an Illinois grand jury indicted defendant for

robbery, alleging substantially identical facts in its indictment as were alleged in the federal indictment. Defendant was tried and found guilty. *Id.* Two facts demonstrated a link between the two prosecutions. First, in order to assist the state authorities, the FBI agent who conducted the investigation on behalf of the federal government turned over to the state prosecutors all the evidence he had gathered against the defendant and cooperated with the state authorities throughout the investigation. *Id.* Second, the federal sentencing of accomplices who testified against defendant in both trials was continued by the federal court until after they testified in the state trial. *Id.* at 122–23, 79 S.Ct. at 677–78. The Court found that these facts did *not* suggest that the second prosecution was prohibited, stating:

It does not support the claim that the State of Illinois in bringing its prosecution was merely a tool of the federal authorities, who thereby avoided the prohibition of the Fifth Amendment against a retrial of a federal prosecution after an acquittal. It does not sustain a conclusion that the state prosecution was a sham and a cover for a federal prosecution, and thereby in essential fact another federal prosecution.

*Id.* at 123–24, 79 S.Ct. at 678–79. Therefore, courts considering whether to apply the "sham prosecution" exception to dismiss a second indictment against a defendant must show that one sovereign was so dominated, controlled or manipulated by the actions of the other that it did not act of its own volition. *United States v. Baptista–Rodriguez,* 17 F.3d 1354, 1361 (11th Cir.1994).

Defendant argues that the "sham prosecution" exception applies to the present case for several reasons. First, the prosecution by the State of Delaware resulted in a complete acquittal of all charges. Second, agents of the Bureau of Alcohol, Tobacco and Firearms played key roles in the failed state prosecution during both the investigative and trial phases. Third, the only new evidence that was obtained after the failed state prosecution and presented to the grand jury to obtain the Indictment was the recantation of the testimony of Diana Gonzalez, defendant's daughter. Fourth, after hearing of Diana

Gonzalez's recantation, state officials initiated contact with federal prosecutors concerning a federal retrial of defendant, and joint meetings were held. Finally, the Indictment was obtained without federal prosecutors ever having interviewed Ms. Gonzalez concerning the substance of her recanted testimony. For those reasons, defendant urges, the Indictment falls into the "sham prosecution" exception alluded to in *Bartkus*, and should therefore be dismissed.

The Third Circuit Court of Appeals has not conclusively ruled on whether the "sham prosecution" exception is a viable exception to the dual sovereignty doctrine. However, *United States v. Pungitore*, 910 F.2d 1084 (3d Cir.1990), *cert. denied*, 500 U.S. 915, 111 S.Ct. 2009, 114 L.Ed.2d 98 (1991), discussed the viability of the dual sovereignty doctrine, and rejected the notion that a lack of independence between the federal and state prosecutions would necessarily produce a violation of the Double Jeopardy Clause. There, defendants being tried in federal court for RICO violations, after being tried in state court for the predicate offenses, argued that the dual sovereignty doctrine is subject to an exception where "the federal authorities are so intimately involved in the state prosecution that it would be fundamentally unfair to allow them to bring a separate prosecution." *Id.* at 1106. The Third Circuit appellate court declined to take a position on the issue, finding that even if such an exception were viable, the defendants could not point to any facts which demonstrated federal involvement with the state prosecutions. *Id.* at 1106–07. On the issue of whether an exception to the dual sovereignty doctrine exists, the court stated:

> We are not to be understood as suggesting that there should be a qualification on the dual sovereignty doctrine when the federal prosecutors are intimately involved in the state proceedings. In practice a bright line test based on the identity of the prosecuting sovereigns may be required, as a more flexible test considering the degree of federal-state cooperation may not be workable. Furthermore, *regardless of the degree of cooperation between the prosecutors, the fact remains that the separate prosecutions vindicate the authority of different governments.* Here, however, there is no factual predicate for applying an exception to the dual sovereignty doctrine on the basis of federal-state cooperation. Thus, we have no reason to make a definitive determination of whether there is any qualification on the doctrine.

*Id.* at n. 20 (emphasis supplied). While not taking a position, it seems clear that the Third Circuit Court of Appeals has nonetheless demonstrated a reluctance to recognize any qualification on the right of each sovereign to vindicate a violation of its laws.

Since the Third Circuit Court of Appeals has not ruled on the viability of the "sham prosecution" exception, attention is turned to other Circuits for guidance in determining whether the facts in this case demonstrate that the federal prosecution is, in fact, a "sham prosecution." The Eleventh Circuit Court of Appeals recently addressed the "sham prosecution" exception in *Baptista–Rodriguez*, 17 F.3d 1354. There, the Bahamian government instituted criminal proceedings against the defendants which did not result in a conviction. *Id.* at 1359. Subsequently, the United States government indicted defendants in federal court. *Id.* The court found that the "sham prosecution" exception did not apply, in spite of the fact that American officials (1) initiated and performed the Bahamian investigation, (2) conducted all undercover negotiations, and (3) testified as principal witnesses in the Bahamian trial. *Id.* at 1361. The court noted that conclusory allegations such as "the entire Bahamian prosecution was either conducted directly by, or supervised and conducted indirectly by, American law enforcement and prosecutorial authorities" does not establish a prima facie case under this narrow exception. *Id.* at 1362. Other Circuits are equally reluctant to find facts meriting invocation of the "sham prosecution" exception. *See United States v. Guy*, 903 F.2d 1240 (9th Cir.1990) (federal government reliance on information provided by state does not negate independence of federal prosecution); *United States v. Bernhardt*, 831 F.2d 181 (9th Cir.1987) (fact that same state prosecutor tried both cases, and fact that state funded both proceedings still insufficient to warrant invocation of the

"sham prosecution" exception); *United States v. Liddy*, 542 F.2d 76 (D.C.Cir.1976) (cooperation between federal and state officials in state prosecution does not demonstrate that state officials were mere "tools" of the federal government).

Defendant's allegations of identity between the state and federal prosecutions fail to establish facts sufficient to deem the federal prosecution a "sham prosecution." At the most basic level, defendant alleges nothing more than cooperation between state and federal officials. As discussed above, this has never been sufficient to establish the inextricable identity of prosecutions which other Circuits require. The fact that the same evidence was used to obtain both indictments is unexceptional: obviously, two crimes arising out of the same conduct would involve the same evidence. Accordingly, the Court finds that the "sham prosecution" exception mentioned in *Bartkus* is not applicable to this Indictment, and defendant's Motion to Dismiss the Indictment on this ground will be denied.

**B. *Delaware Double Jeopardy Bar to Court III***

■ Defendant next argues that Count III of the Indictment should be dismissed. Count III alleges a violation of 18 U.S.C. § 1952 (the "Travel Act"), which makes it a federal offense for an individual to travel in interstate commerce with the intent to promote or facilitate the promotion of any activity in violation of the laws of any state. The Indictment alleges that defendant violated the Travel Act by traveling in interstate commerce with the intent to commit arson, in violation of 11 *Del.C.* § 803. Defendant argues that under the reasoning of *United States v. Bertman*, 686 F.2d 772 (9th Cir. 1982), defendant should be entitled to raise any defense which would be available to him if the underlying state law offense were charged. In *Bertman*, a defendant was charged with violating the Travel Act by allegedly traveling interstate with "the intent

to promote or facilitate the promotion of bribery." *Id.* at 774. The court found that because the federal crime was inextricably tied to the state law bribery offense, the defendant could assert any relevant substantive state law defense. *Id.* Since coercion was a defense to bribery under state law, the court allowed defendant to invoke the defense in the federal forum. *Id.*

Defendant argues that *Bertman* permits him to assert any state law defense to the Travel Act charge. Accordingly, defendant argues that the Double Jeopardy Clause of the Delaware Constitution bars prosecution for the Travel Act count in the Indictment. *See* Del.Const. Art. 1, § 8.[1] Since the Double Jeopardy Clause would preclude a subsequent state prosecution for arson after his acquittal, it should also preclude prosecution under the Travel Act. This argument is without merit.

As discussed in Part III(A), *supra*, the federal government's interest in vindicating violations of its laws significantly differs from the State of Delaware's interest in prosecuting the predicate offenses. *See Pungitore*, 910 F.2d at 1105. Both sovereigns legitimately claim a strong interest in penalizing the same behavior, and may independently determine what shall be an offense against its own peace and dignity. *United States v. Lanza*, 260 U.S. 377, 382, 43 S.Ct. 141, 142, 67 L.Ed. 314 (1922). The Third Circuit Court of Appeals has interpreted the dual sovereignty doctrine to mean that "an acquittal in state court does not preclude the government from charging the offense subject to the acquittal as a predicate to the federal prosecution." *Pungitore*, 910 F.2d at 1105 (collecting cases). Defendant's conduct, even though it may have involved same operative facts considered in the state prosecution, contains an added element of significance to the federal government: the effect of the alleged illegal activity on interstate commerce. *Id.;* *see also United States v. Frumento*, 563 F.2d 1083, 1088 (3d Cir.1977), *cert. denied*, 434

---

1. The Delaware Supreme Court has held that the Double Jeopardy provisions in the United States Constitution and the Delaware Constitution are similar, *see Monroe v. State*, 652 A.2d 560, 567 (Del.1995), but has not had occasion to decide whether the state Double Jeopardy Clause is identical in scope to its federal counterpart. *See Chao v. State*, 604 A.2d 1351, 1360 n. 8 (Del. 1992). This case does not require that such a determination be made.

U.S. 1072, 98 S.Ct. 1256, 55 L.Ed.2d 775 (1978). In light of the unique nature of the federal and state interests in prosecuting the defendant's activities, the Court holds that the Double Jeopardy Clause does not bar this federal prosecution, as the case falls squarely within the dual sovereignty doctrine.

## C. *Loss of Exculpatory Evidence and Unavailability of Defense Witnesses*

■ Defendant's final argument in support of his Motion to Dismiss the Indictment is based on the Fifth Amendment Due Process Clause. Defendant argues that the four year and fifty-one week delay in bringing the Indictment violates defendant's due process rights because the delay has materially and substantially prejudiced defendant's ability to defend against the charges. Defendant relies on the Supreme Court decision in *United States v. Marion*, 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971), which held that the Due Process Clause of the Fifth Amendment would require dismissal of the indictment if it were shown, among other things, that preindictment delay caused actual prejudice to the defendant. *Id.* at 324, 92 S.Ct. at 465. Defendant submits that actual prejudice exists in this case due to the destruction of exculpatory evidence and unavailability of certain defense witnesses.[2] Although defendant separates the due process argument from the destruction of evidence argument, there is no difference between the two in the context of this case: the prejudice resulting from the delay defendant argues to be a violation of his due process rights is *caused* by the inability to produce evidence and witnesses. Accordingly, the two arguments will be treated together. The Court will first address the destruction of evidence, and then discuss the unavailability of defense witnesses.

### 1. *Destruction of Evidence*

■ Defendant argues that the destruction of exculpatory evidence in this case is grounds for dismissal of the Indictment. Specifically, defendant argues that the failure of the New Castle County Police to preserve the yellow bucket of tools found at the victim's home, allegedly containing exculpatory evidence, constitutes bad faith. The tools and items contained in the bucket are argued to be component parts of a homemade bomb, which would suggest that the victim himself made the bomb which led to his unfortunate fate. As a result, defendant asserts he is prejudiced in his ability to defend himself. Defendant emphasizes that there is often no substitute for the "power of physical evidence," and thus, presenting the actual bucket of tools to the jury is critical to his defense.

■ Defendant's burden to prove a denial of due process arising out of the government's failure to preserve potentially useful evidence is twofold. First, defendant must prove that the exculpatory value of the item destroyed was apparent before its destruction, and was of such a nature that defendant would be unable to obtain comparable evidence from other reasonably available means. *California v. Trombetta*, 467 U.S. 479, 489, 104 S.Ct. 2528, 2534, 81 L.Ed.2d 413 (1984). Second, defendant must prove that the government's failure to preserve evidence constitutes bad faith. *Arizona v. Youngblood*, 488 U.S. 51, 58, 109 S.Ct. 333, 337, 102 L.Ed.2d 281 (1988) (failure to refrigerate clothing and

---

**2.** Defendant alternates between describing the evidence as "lost" and "destroyed." Destruction of evidence connotes bad faith on the part of the authorities, while loss of evidence connotes negligence or inadvertence. This distinction is not irrelevant, because in *United States v. Cooper*, 983 F.2d 928 (9th Cir.1993), on which defendant principally relies, one of the primary motivating factors compelling the court to dismiss the indictment was the government's bad faith. The court states as much in its opening paragraph, "Because of the *government's bad faith actions*, the laboratory equipment seized from Apotheosis Research lies broken and buried in a toxic waste dump. This equipment cannot be introduced at trial. . . . We conclude that no alternative matches the potentially powerful *exculpatory evidence destroyed by the government*. The appropriate remedy is dismissal of the indictment." *Id.* at 929 (emphasis supplied). In his post-hearing Brief in Support of Dismissal of the Indictment, defendant specifically argues that the government, in bad faith, failed to preserve certain evidence. As to these pieces of evidence, the Court will require the defendant to prove the additional element of specific intent in order to prevail on this argument. *See infra.*

perform certain tests on fluids found thereon was deemed to be at worst negligent, and did not demonstrate the requisite mental state necessary to make out a due process claim). These burdens are interrelated: bad faith is proved by showing that the evidence had exculpatory value apparent to the police, but was nonetheless destroyed. *See United States v. Cooper*, 983 F.2d 928, 931 (9th Cir.1993).

In his brief in support of the Motion to Dismiss the Indictment, defendant argues that the government's handling of the bucket of tools constitutes bad faith. Defendant does not take the position that the government destroyed the contents of the bucket, but rather, argues that the *return* of the evidence back to the victim's wife constitutes bad faith. At the hearing on this motion on October 16–17, 1995, Detective Robert Larrimore, the officer in charge of supervising the gathering and custody of evidence, testified that the bucket was returned to the victim's wife on June 11, 1991. He was unsure if, prior to the return of the bucket, the items contained therein were removed for the purpose of conducting an inventory. Detective Larrimore also testified that before the bucket was returned, and before any items were removed from the bucket, a photograph was taken which depicts some of the contents of the bucket at the time it was removed from the victim's residence. Bad faith on the part of the police has not been demonstrated, but even assuming *arguendo* that it was, defendant cannot satisfy the *Trombetta* requirement that the evidence be of the type which cannot be obtained by other reasonably available means. It is conceded by the government that certain items which were contained in the bucket are missing. However, the state trial transcript, while in minor part nontranscribable, provides a rather complete inventory of everything that was in the bucket. D.I. 53, Exhibit B.[3] The government is willing to recreate the bucket as it was in the state trial as accurately as possible, by substituting identical items for the lost originals. The government's proffer is a reasonable accommodation. The defendant will retain his ability to argue the exculpatory value of the items to the jury, and will not lose the "power of the physical evidence" recognized by the *Cooper* court and believed to be so critical by the defendant.

■ Defendant also argues that certain photographs of the defendant's home are "unavailable," further prejudicing his defense. The photographs were taken of defendant's home, which has since been destroyed after inverse condemnation proceedings. First, the exculpatory value of these photographs has not been explained, nor can the Court determine how these photos would aid the defense. Second, the defendant does not assert that these photographs were "destroyed," nor does he fault the bad faith of the government as the reason for their loss. Indeed, the defendant suggests that he himself may have failed to preserve the photographs, but that it was not unreasonable for him to do so, given the years intervening between the two prosecutions. The Court cannot conclude that the unavailability of these photographs prejudices the defendant when their exculpatory value is unknown. Furthermore, the responsible party for their loss has not been identified. Therefore, the Court is unable to consider the prejudice to the defendant and the bad faith of the police, since neither has been alleged. Accordingly, this argument is without merit.

■ Next, defendant argues that a portion of the floorboard with an imprint left by paint found in defendant's former home has been lost, prejudicing the defense. In the state trial, defendant's father introduced the floorboard into evidence and testified that he had observed the paint imprint on the floorboard prior to the bombing, which would suggest that the imprint was *not* made in connection with the construction of the homemade bomb. Defendant does not argue that the government is responsible for the destruction of this evidence. Like the photographs discussed above, defendant admits that he is unable to find the floorboard, but this inability is not unreasonable. The gov-

---

**3.** It should be noted that the testimony of another witness was virtually useless, because it was nontranscribable. D.I. 53, Exhibit C.

ernment has provided defendant with photographs of the floorboards, taken shortly after the offense, which accurately depict the condition of the floor at the relevant time. Neither the actual floorboards nor the photographs provide any direct evidence of *when* the paint imprints were made, the critical fact defendant seeks to establish with their introduction into evidence. Accordingly, neither piece of evidence is more persuasive than the other, and the Court finds that defendant will not be prejudiced by relying on the photographs.

■■■ Defendant also argues the loss of certain telephone bills prejudices his defense. Like the floorboard, defendant himself lost the telephone bills. Their exculpatory value is also unknown to the Court. Thus, the Court cannot determine the prejudice to the defendant by their loss. Should the defendant provide the Court with the basis for their exculpatory value at some later point in the proceeding, the Court will ensure, if possible, that the contents of the telephone bills are made known to the jury. However, the unavailability of the telephone bills is not a ground for dismissal of this Indictment.

### 2. *Unavailability of Defense Witnesses*

Defendant argues that certain witnesses who testified at the state trial are now unavailable to testify, and his defense will be prejudiced by their absence. In order to determine the prejudice to defendant by their absence, the Court will group the witnesses according to the purpose of their testimony.

### a. Character Witnesses: Defendant's Reputation for Truthfulness and Peacefulness

■■■ At the state trial, defendant offered the testimony of Luis Miranda, Fr. Penaloza, Stephen Zappalla, Dr. Legesse, Luis and Wanda Testidor, and Fernando and Maria Gonzalez, defendant's parents, to testify as to defendant's reputation for honesty and

peacefulness. Each of these witnesses is either deceased, of failing health, out of the country, or his whereabouts are generally unknown. Defendant argues that the inability of these witnesses to testify prejudices his ability to conduct his defense. The Court is not persuaded. First, many of these witnesses live in remote locations or are in failing health. It is unlikely, therefore, that they have any familiarity whatsoever with the defendant's reputation at the present time. Thus, their testimony as to defendant's reputation would be marginally relevant, at best. Further, the Court notes that five years have elapsed since the state trial. During that time, defendant has been charged with other crimes which may well affect the witnesses' opinions as to defendant's character for honesty and peacefulness. Defendant would, in that case, be compelled to find other character witnesses willing to testify as to his reputation. Accordingly, the Court holds that defendant has not demonstrated sufficient prejudice caused by the lack of these character witnesses to warrant dismissal of the Indictment.

### b. Character Witnesses: Victim's Poor Reputation for Peacefulness

■■■ Defendant presented Luis Miranda, Luis and Wanda Testidor, and Fernando and Maria Gonzalez at the state trial to as testify to the victim's poor reputation for peacefulness. Under the Federal Rules of Evidence, character evidence of the victim is inadmissible in a criminal trial unless it is offered for certain specified reasons, such as supporting or rebutting the inference that the victim was the first aggressor and that the defendant acted in self defense. Fed.R.Evid. 404(a)(2). These inferences are not relevant to the present case and will not be made at trial. Accordingly, evidence concerning the victim's poor reputation for peacefulness will not be admissible at trial. Thus, defendant will suffer no prejudice due to the unavailability of these witnesses.[4]

4. The Court is informed that at the state trial, the prosecution "opened the door" to testimony regarding the victim's poor reputation for peacefulness by inquiring of his widow as to his reputation for peacefulness. Unless the government plans to similarly open to door on this issue in the present case, defendant will be unable to offer rebuttal witnesses to demonstrate the victim's poor reputation for peacefulness.

### c. Percipient Witnesses

 Defendant called Jaime Gonzalez, Jr., defendant's son, as a witness in the state trial, to testify that he purchased batteries and wire for stereo speakers from a store shortly before the bombing occurred. This testimony was offered to rebut the government's evidence consisting of a receipt from the store made out to Jaime Gonzalez, which was offered to show that the defendant purchased the batteries for use in the homemade bomb. The government has indicated that it is willing to discuss a possible stipulation with the defendant as to this witness. If a stipulation is not reached, the Court, out of fairness to the defendant, will cause the facts relating to the battery purchase to be made known to the jury.

Defendant also called Luis Miranda to testify that he observed the victim constructing what appeared to be a homemade bomb, which would suggest that the victim may have been responsible for the bombing. This testimony has exceptional exculpatory value, and the Court recognizes the prejudice defendant would suffer if the evidence is not before the jury. The government also recognizes the potential exculpatory value of this witness, and is willing to reach a stipulation with the defendant regarding this testimony. The Court does not believe that the unavailability of this single witness should cause the entire Indictment to be dismissed. If, for some reason, the parties do not reach agreement as to getting this testimony before the jury, the Court will exercise its inherent power to do so.

 Finally, defendant offered the testimony of Teodoro and Maria Villazone to rebut the prosecution's proffer that the defendant was arrested for assault upon them, by testimony that they were never, in fact, assaulted. Prior instances of bad acts are not admissible at trial to demonstrate conformity therewith, *see* Fed.R.Evid. 404(a), nor can specific instances of conduct be used to prove character, unless the character of the defendant is an essential part of the charge or defense, *see* Fed.R.Evid. 405(b). Evidence of the assault would not be admissible to demonstrate a possible connection with the bombing. The government, may, however, choose to offer the evidence to rebut defendant's testimony that he has never been arrested for assault. If the situation arises at trial such that the testimony of Teodoro and Maria Gonzalez is necessary for rebuttal, their prior testimony will be put before the jury. However, the Court cannot conclude at this time that the inability of these witnesses to testify will prejudice the defendant's ability to conduct his defense.

### IV. Conclusion

The Court concludes that the federal prosecution is not a "sham prosecution" within the meaning of *Bartkus v. Illinois, supra,* and the Indictment will not be dismissed on that ground. Further, the Double Jeopardy Clause of the Delaware Constitution does not bar prosecution of the Travel Act Count. Finally, the Court finds that the loss or destruction of evidence and the unavailability of witnesses caused by pre-indictment delay does not constitute a denial of defendant's Fifth Amendment Due Process rights. Accordingly, defendant's Motion to Dismiss the Indictment will be denied in full. An order setting forth these conclusions will issue.